Robert A. Miller, OSB #732050
Email: ram@miller-wagner.com
LAW OFFICE OF ROBERT A. MILLER
2260 Oakmont Way, Suite 7
Eugene, Oregon 97401
Telephone:    (541) 683-2004
Facsimile:    (541) 683-4940

    Attorney for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE STATE OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| **ISABEL M. MIHALICH**, as Personal Representative of the **ESTATE OF MICHAEL AMADOR SANCHEZ**, Deceased,<br><br>                    Plaintiff,<br><br>v.<br><br>**CITY OF EUGENE**, a municipal corporation, **CHRIS SKINNER**, in his official capacity as Chief of Police with Eugene Police Department, **CARLOS M. JONES**, in his individual capacity, **JESSICA D. DALTON**, in her individual capacity, **DAVID F. CLARK**, in his individual capacity, **TYLER L. TREMAIN**, in his individual capacity, **MATTHEW D. TWITE**, in his individual capacity, **RYAN J. UNDERWOOD**, in his individual capacity,<br><br>                    Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>**Civil Rights Act**<br>(42 U.S.C. § 1983);<br><br>**Americans with Disabilities Act**<br>(42 U.S.C. § 12101 *et seq* &<br>29 U.S.C. § 794 *et seq*);<br><br>**Oregon Tort Claims Act**<br>(Or. Rev. Stat. § 30.260 *et seq*)<br>Wrongful Death & Negligence<br><br>Demand for Jury Trial |

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON 97401-6041
(541) 683-2004

    PLAINTIFF, by and through its attorneys, the Law Office of Robert A. Miller, and for its

Complaint against Defendants, alleges as follows:

COMPLAINT - Page **1** of **24**

## NATURE OF ACTION

1.   Plaintiff brings this civil rights action pursuant 42 U.S.C. § 1983, 42 U.S.C. § 12133, 29 U.S.C. § 794, and ORS 30.265. Isabel M. Mihalich is the court-appointed personal representative of the Estate of Michael Amador Sanchez. On January 30, 2019, Mr. Sanchez asphyxiated in the back of a police vehicle during an arrest in which he was exhibiting symptoms of his mental illness. The acts and omission of the Defendants deprived Mr. Sanchez of his rights provided by the Fourteenth Amendment to the United States Constitution and Title II of the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("Rehab Act"), and establish a claim for wrongful death under state statutory common law. Mr. Sanchez suffered economic and noneconomic harm as a result of the acts and omissions of Defendants. Plaintiff is entitled to an award of economic and noneconomic damages, punitive damages, and attorney's fees and costs.

## JURISDICTION AND VENUE

2.   This court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 1343, in that the claim involves a violation of federal constitutional rights and statutory rights and arises under 42 U.S.C. §§ 1983 and 12133 and 29 U.S.C. § 794. Pursuant to 28 U.S.C. § 1367, this court has jurisdiction over Plaintiff's pendant state law claim.

3.   Venue is proper in the District of Oregon pursuant to 28 U.S.C. § 1391: a substantial part of the events giving rise to Plaintiff's claims occurred in the District of Oregon; at all material times alleged herein, Mr. Sanchez was a resident of the District of Oregon; individual Defendants are, upon information and belief, residents of the District of Oregon; and Defendant, City of Eugene, is a municipality located within the District of Oregon.

///

///

///

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON 97401-6041
(541) 683-2004

## TORT CLAIM NOTICE

4.   Plaintiff has complied with the requirements of ORS 30.275. On or about June 3, 2019, Plaintiff mailed an Oregon Tort Claim Notice to the City Manager's Office of the City of Eugene containing all information required by ORS 30.275(4). On November 20, 2019, Plaintiff mailed a supplemental Oregon Tort Claim Notice to the City Manager's Office of the City of Eugene notifying the City of Eugene that Michael A. Sanchez had died on September 28, 2019.

## PARTIES

5.   Michael A. Sanchez died intestate on September 28, 2019. At all material times, Mr. Sanchez resided in the District of Oregon. Isabel M. Mihalich is Mr. Sanchez's sister. On October 20, 2020, the Lane County Circuit Court appointed Ms. Mihalich as personal representative of the estate of Michael Amador Sanchez. Ms. Mihalich is a resident of California.

6.   At all material times, the City of Eugene (the "City") was a local government entity within the State of Oregon. As such, the City is a person under 42 U.S.C. § 1983 and a public entity under 42 U.S.C. § 12131(1).

7.   At all material times, Chris Skinner ("Chief Skinner") was the Chief of Police for the Eugene Police Department ("EPD"), an entity and / or subsidiary of the City of Eugene, and acted in his official capacity as such.

8.   At all material times, the City employed the following individuals (collectively, "EPD Officers") as law enforcement officers for EPD: Dalton, Jessica D., EPD No. 367; Jones, Carlos M., EPD No. 685; Twite, Matthew D., EPD No. 684; Clark, David F., EPD No. 614; Tremain, Tyler T., EPD No. 1107; Underwood, Ryan J., EPD No. 699. At all material times, these individuals acted under color of state law. Plaintiff sues them in their individual and personal capacity.

///

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON 97401-6041
(541) 683-2004

## FACTUAL ALLEGATIONS

### Background

9.  In December of 2016, the Lane County Performance Auditor's Office published an audit titled "Lane County Community Mental Health Program."[1] That audit found that "at least one in 35 Lane County adults has a severe and persistent mental illness (SPMI), such as schizophrenia or bi-polar disorder. Individuals with SPMI are at risk of cycling in and out of psychiatric hospitalization or jail." It further found that SPMI can "cause people to have major communication or behavior problems, an inability to function in most areas of life, or be in danger of hurting themselves or others." "Suicide," the audit noted, "is also a risk for individuals with SPMI." Moreover, the report indicates that people suffering from SPMI have an increased risk of contact with law enforcement and incarceration. Specifically, it states, "Law enforcement officers regularly interact with individuals experiencing mental illness." "In Lane County, a large number of individuals experiencing mental illness are in local jails. The Lane County Jail estimates 60% of inmates at any given time are experiencing mental illness."

10. In the Civilian Review Board's audit of the police shooting of Brian Babb[2] in 2015, the board recommended that the City of Eugene provide Crisis Intervention Team ("CIT") training to EPD call dispatchers and 9-1-1 call-takers. It also recommended that "EPD should consider additional personnel, or more specialized officers and dispatchers in mental health crisis, beyond the 40 hours of CIT training."

///

///

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON  97401-6041
(541) 683-2004

---

[1] https://www.lanecounty.org/UserFiles/Servers/Server_3585797/File/Government/County%20Departments/County%20Performance%20Auditor/CMHP_2016_02_revised.pdf
[2] https://www.eugene-or.gov/ArchiveCenter/ViewFile/Item/4066

11. The October 5, 2017 agenda notes from a meeting that occurred on September 18, 2017, titled "Lone Armed Barricaded Subject Meeting,"[3] identified EPD's need for "more attention and care for suspects with significant mental health issues," "more mental health training for all officers and call-takers," and the "need to develop stronger disengagement strategies and plans."

**Eugene Police Department Policies**

12. EPD Policy 300 establishes that EPD officers should take caution during arrest to prevent a restrained arrestee from experiencing "positional asphyxia." It identifies contributing factors of positional asphyxia to include "illness" and "restraint or entrapment (e.g., hobbled and in prone position)."

13. EPD Policy 409 sets out EPD's policy regarding Prisoner Transport and applies to "anyone restrained and being transported in a patrol car." It establishes the following:

    a) "Prisoners should be transported with a seatbelt properly secured unless the safety of the custody[] or the officers may be compromised by securing the seat belt. Exceptions may include prisoners who are combative, spitting, hobbled, or unable to wear the seat belt as designed;" and

    b) Officers "may use any of the following restraint devices when transporting a prisoner, or a combination thereof:" "handcuffs;" "Flexible Restraint Devices (FRD);" "Flex-cuffs;" "spit hood;" and "belly chain and leg shackles."

14. EPD Policy 418 sets out EPD's policy regarding Mental Health Crisis Response. It requires each EPD officer to complete CIT training. It further establishes the following policies:

    a) EPD officers should "evaluate the need for assistance from individuals with specialized training in dealing with mental illness;"

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON 97401-6041
(541) 683-2004

---

[3] https://www.eugene-or.gov/Archive/ViewFile/Item/4975

COMPLAINT - Page **5** of **24**

b) "Emergency lights and siren should be used only when urgency is required, and these devices should be turned off as soon as possible upon arrival;"

c) With incidents involving a "C" felony or lessor offense, EPD officers should consider citing in lieu of custody and, depending on the subject's demeanor, either releasing or proceeding with the police officer hold process;"

d) "An officer dealing with a person in crisis should attempt to establish a safe environment that will be conducive to successful de-escalation and resolution of the incident;"

e) "Non-engagement or disengagement are tactics that can be used if the officer determines that contact or continued contact with the person will result in an undue safety risk to the person, public, and/or officers;"

f) "Delaying custody is a tactic that can be used if the officer determines that taking the person into custody under the present circumstances may result in an undue safety risk to the person, public, and/or officers;" and

g) "Violent patients or those that are medically unstable may be restrained and transported by ambulance with an officer accompanying ambulance personnel."

15. EPD Policy 806 sets out EPD's policy regarding the use of Flexible Restraint Device ("FRD"). It establishes the following:

a) "Officers should make every reasonable attempt to limit the amount of time a subject who has been placed in an FRD is in a face-down, prone position;"

b) "Officers should only use the FRD for the shortest period of time necessary to avoid injury to officers or the suspect, or damage to property;"

///

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON 97401-6041
(541) 683-2004

COMPLAINT - Page **6** of **24**

c)  "Officers should continually monitor a subject in an FRD for labored breathing, and where practicable take whatever appropriate steps to relieve obvious factors contributing to this condition;" and

d)  "An officer who suspects that a subject is experiencing excited delirium while in an FRD must recognize that this is a medical emergency and summon emergency medical assistance immediately."

16. EPD Policy 820, EPD's policy regarding De-escalation, establishes that "Officers should make every possible effort to de-escalate confrontations to prevent the need to use force." It identifies the following tactics and techniques for de-escalation:

a)  "Tactile communications, including active listening. Communication with the subject should be limited to one officer at a time in order to ensure clear communication;"

b)  Attempting to build rapport with the subject: "If one officer is unable to build rapport with a subject, another one should be given an opportunity to communicate with the subject whenever reasonably possible;"

c)  "When safe and feasible under the totality of the circumstances, officers shall attempt to slow down or stabilize the situation so that more time, options and resources are available for the incident;" and

d)  "When time and circumstances reasonably permit, officers shall assess and attempt to accommodate[] whether a subject's lack of compliance is a deliberate attempt to resist, or an inability to comply based on factors including," "medical conditions," "mental impairment," "behavioral crisis," and "emotional response / fear."

///

///

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON  97401-6041
(541) 683-2004

**Michael Sanchez's Contacts with Law Enforcement Prior to January 30, 2019**

17. Mr. Sanchez had a medical diagnosis of bipolar disease with psychotic features. In early 2019, Mr. Sanchez was suffering from an ongoing mental health crisis related to that condition. His mental state was rapidly deteriorating.

18. On January 16, 2019, EPD Officer Carlos M. Jones, EPD No. 685 ("Jones"), contacted Mr. Sanchez in the downtown section of Eugene, Oregon to investigate whether he was armed with a knife. During the investigation, Jones determined that Mr. Sanchez had not committed a crime. Because he believed Mr. Sanchez was intoxicated, Jones arranged for a taxi to take Mr. Sanchez home. Prior to entering the taxi, Mr. Sanchez accused Jones of stealing money from him. Jones and / or another EPD officer showed Sanchez that his money was in his pocket, and Mr. Sanchez left in the taxi.

19. The next day, January 17, 2019, Jones again contacted Mr. Sanchez, again in the downtown section of Eugene, Oregon. Over the past day, Mr. Sanchez had called 9-1-1 several times, claiming that EPD officers had stolen $1,600.00 from him. Jones's report from this incident alleges that on those phone calls Mr. Sanchez made threatening comments to the 9-1-1 call-taker. Jones arrested Mr. Sanchez for suspicion of violating Eugene City Code 4.904(a). During the arrest, Jones and / or another EPD officer found $1,480.00 in one of Mr. Sanchez's pockets. While being transported to the Lane County Detention Center, Mr. Sanchez began to slam his head against the partition separating the back of the police vehicle from the front. Jones's report states, "Once inside the jail, Sanchez's behavior continued to deteriorate." Mr. Sanchez was ultimately held in one of the jail's segregation cells.

20. Mr. Sanchez had contact with EPD officers several more times between January 17, 2019 and January 30, 2019. Specifically, in his report from January 30, 2019, EPD Officer Ryan J.

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON 97401-6041
(541) 683-2004

COMPLAINT - Page **8** of **24**

Underwood, EPD No. 699 ("Underwood"), notes, "I am familiar with Sanchez as he had been the subject of multiple calls for service within the last few days…I warned Sanchez of prohibited burning one day earlier."

### Mr. Sanchez's Arrest

21. Paragraphs 21 through 42 describe events that occurred on or about January 30, 2019.

22. On January 30, 2019, Eugene-Springfield Fire Department dispatched a fire engine to respond to a report that an individual (later identified as Mr. Sanchez) had lit a fire in a wheelbarrow outside of Costal Farm and Home Supply at 2200 West Sixth Avenue, Eugene, Oregon, 97402. Jordan Peterson, an employee of Eugene-Springfield Fire Department spoke with Mr. Sanchez. He observed that Mr. Sanchez seemed to be struggling with a mental health crisis, an observation he conveyed to EPD officers when they arrived at the scene.

23. At no point in time did anyone request assistance from an individual with specialized training in dealing with mental illness.

24. Shortly after Eugene-Springfield Fire Department arrived at Costal Farm and Home Supply and communicated with Mr. Sanchez, numerous EPD officers contacted and ultimately arrested Mr. Sanchez and took him into custody. These officers included but were not limited to the following individuals: Jones; Dalton, Jessica D., EPD No. 367 ("Dalton"); Twite, Michael D., EPD No. 684 ("Twite"); and Clark, David F., EPD No. 614 ("Clark").

25. At no point in time did any EPD officer attempt to use tactics and / or techniques intended to de-escalate, delay custody, or disengage.

26. Dalton responded to the call regarding unlawful burning at Costal Farm and Home Supply. While responding to the call, Dalton observed Mr. Sanchez, who matched the description of the suspect, running northbound in the center divider of HWY 99 in Eugene,

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON 97401-6041
(541) 683-2004

Oregon. Mr. Sanchez was carrying a garbage can lid. Dalton activated the police vehicle's lights, stopped the vehicle in the lane of travel, and exited the vehicle. Mr. Sanchez began to run across the southbound lanes of HWY 99, away from Dalton. Dalton pursued Mr. Sanchez on foot and ordered him to stop. Per Dalton's report, Mr. Sanchez stopped running, turned toward Dalton, dropped the garbage can lid, and then began to walk away from Dalton. Dalton continued to pursue Mr. Sanchez, grabbed the back of his jacket, and forced him to the ground. Dalton's report indicates that Mr. Sanchez complied and went to the ground.

27. Twite also responded to the same call. The vehicle Twite was driving was behind the vehicle driven by Dalton, with another police vehicle in between Twite's vehicle and Dalton's vehicle. Twite observed Dalton pursue Mr. Sanchez on foot. Twite activated his police vehicle's lights, stopped the vehicle in the lane of travel, exited the vehicle, and pursued Mr. Sanchez. Twite assisted Dalton in handcuffing Mr. Sanchez while he was on the ground. Per Twite's report, Twite read Mr. Sanchez his Miranda rights and when he asked Mr. Sanchez if he understood his rights, Mr. Sanchez replied, "No, sir, I need an attorney."

28. Clark also responded to the same call. Clark was driving a police vehicle that was several vehicles behind Dalton. Clark observed Dalton and Twite pursuing Mr. Sanchez on foot. Clark activated his police vehicle's lights, turned the vehicle into the driveway of a business, and then turned the vehicle to head northbound on a bike path that abuts and parallels HWY 99. Clark stopped his vehicle on the bike path, exited it, and assisted Dalton and Twite in handcuffing Mr. Sanchez while he was on the ground.

29. Jones also responded to the same call. Jones was also driving a police vehicle. He observed Dalton and Twite attempting to handcuff Mr. Sanchez. Jones activated his police

///

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON 97401-6041
(541) 683-2004

vehicle's lights, stopped the vehicle in the lane of travel, exited the vehicle, and assisted Dalton, Twite, and Clark in handcuffing Mr. Sanchez while he was on the ground.

30. Once the EPD officers had handcuffed Mr. Sanchez, he refused to stand and remained lying in the roadway of HWY 99. Dalton, Twite, and Jones physically picked Mr. Sanchez up, and Twite and Jones walked Mr. Sanchez to Jones's police vehicle. As they did so, Mr. Sanchez lunged forward, away from Twite and Jones and into the southbound lane of travel of HWY 99 towards oncoming traffic. Jones secured Mr. Sanchez. Mr. Sanchez then went becoming dead-weight and falling to the ground. Mr. Sanchez began to repeat "no, no, no" over and over.

31. As Mr. Sanchez was on the ground, he began to hit his head against the ground. Dalton's report notes that he had to grab Mr. Sanchez by the hair to prevent him from continuing to hit his head against the ground.

32. Dalton, Twite and Jones then attempted to move Mr. Sanchez into the back of Jones's police vehicle. Mr. Sanchez continued to be limp. As Dalton, Twite and Jones were lifting Mr. Sanchez into Jones's police vehicle, Mr. Sanchez hooked his legs under the rear passenger door. For several minutes, Mr. Sanchez continued to struggle against being restrained and placed into Jones's vehicle. Dalton, Twite and / or Jones struck Mr. Sanchez with focused blows intended to inflict pain and thereby subdue Mr. Sanchez. Mr. Sanchez began to slam his head against the center foot divider of Jones's police vehicle—Dalton again grabbed Mr. Sanchez by the hair to prevent him from continuing to slam his head into the floor. Dalton, Twite and Jones eventually restrained Mr. Sanchez's feet with a flexible restraint device ("FRD").

33. With Mr. Sanchez's hands and feet both bound, Dalton, Twite and Jones placed him into the back of Jones's police vehicle and closed the door.

///

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON  97401-6041
(541) 683-2004

**Mr. Sanchez's Injury and Death**

34. Dalton notes in his report that once Mr. Sanchez was in the back of Jones's police vehicle, he was "starting to wedge himself in the floorboard of the vehicle." Mr. Sanchez was on his side, with his legs on the seat and his head on the floor. Dalton's report notes, "I told officers we should transport Sanchez more immediately, due to his position. I also requested Officer Clark follow both officers to the hospital because Sanchez was trying to wedge himself, head first, towards the floorboard."

35. At no point in time did any EPD officer summon emergency medical assistance, such as calling an ambulance to transport Mr. Sanchez to the hospital.

36. No other EPD officer rode in the police vehicle with Jones to monitor Mr. Sanchez.

37. Jones transported Mr. Sanchez to the PeaceHealth University District Emergency Department ("the hospital"). During transport, Mr. Sanchez, his hands and feet still bound, continued to thrash around in the back of the police vehicle. Jones's report states the following: "As I transported Sanchez to the hospital, he continued his violent behavior. Several times his legs were up in the air and I became concerned he would try to break the partition separating the rear passenger area from the front of the vehicle. I was also concerned Sanchez would try to damage the door and other portions of the vehicle while he braced himself against them. Sanchez also flipped his body several times and seemed to throw himself from one side of the car to the other."

38. After some minutes, Mr. Sanchez stopped moving and became quiet. Mr. Sanchez did not respond to Jones's attempts to communicate with him. Once during transport, Jones looked over his shoulder to check on Mr. Sanchez, but his view was obstructed. Another time during

///

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON 97401-6041
(541) 683-2004

transport, Jones attempted to check on Mr. Sanchez using the in-car video system, but the placement of the camera prevented him from being able to observe Mr. Sanchez.

39. At no point in time did Jones pull his vehicle over and attempt to better secure Mr. Sanchez or check on his well-being.

40. When he arrived at the hospital, Jones did not check on Sanchez's well-being. He instead went and spoke to a nurse of the hospital. EPD Officer Tremain, Tyler L., EPD No. 1107 ("Tremain"), arrived at the hospital while Jones was speaking with the nurse. Tremain did not check on Mr. Sanchez's well-being, but instead went to speak with Jones and the nurse. Eventually, Tremian went to check on Mr. Sanchez. When he opened the door, he saw Mr. Sanchez was on his knees and that his head was tilted to the side. Mr. Sanchez's neck was obstructed from view by his jacket. Tremain did not attempt to move the jacket. He called out to Mr. Sanchez several times, and Mr. Sanchez did not respond. At no point in time did Tremain attempt to check Mr. Sanchez's vital signs.

41. Tremain then informed Jones that Mr. Sanchez was not moving. At Jones's and / or Tremain's request, the nurse went to check on Mr. Sanchez. Per Tremain's report, "she moved the subject's head and immediately noticed that the seatbelt had become wrapped around his neck." At the nurse's instruction, the officer's removed Mr. Sanchez's restraints and cut the seatbelt from Mr. Sanchez's neck. In doing so, they saw that the seatbelt was actually wrapped around Mr. Sanchez's neck twice.

42. Once the seatbelt was removed from Mr. Sanchez's neck, the hospital staff checked his vital signs. He was not breathing and he had no pulse. Ultimately, the medical professionals ventilated Mr. Sanchez and were able to restart his heart. Mr. Sanchez had suffered severe neurological damage.

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON 97401-6041
(541) 683-2004

43. Mr. Sanchez never regained consciousness, and he required constant in-patient medical care for the remainder of his life. He died 241 days later on September 28, 2019.

## FIRST CLAIM FOR RELIEF

### 42 U.S.C. § 1983 – Fourteenth Amendment – Deliberate Indifference to Serious Medical Needs – Against EPD Officers

44. Mr. Sanchez re-alleges paragraphs 1 through 42 and incorporates them by reference as though fully set forth herein.

45. Mr. Sanchez alleges this claim for relief against EPD Officers and would have had a right to do so had he survived his injuries.

46. EPD Officers, acting under color of state law and in their individual and personal capacities, deprived Mr. Sanchez of the rights, privileges, and immunities provided by the Fourteenth Amendment to the United States Constitution in that they denied, delayed, or intentionally interfered with Mr. Sanchez obtaining medical treatment by purposefully ignoring and / or failing to respond to Mr. Sanchez's serious but treatable mental health condition, in reckless and deliberate indifference Mr. Sanchez's serious medical needs.

47. The EPD Officers knew and consciously disregarded the fact that failure to treat Mr. Sanchez's mental health condition could result in further significant injury or death.

48. The deprivation of Mr. Sanchez's constitutional rights as alleged herein was the direct and proximate cause of Mr. Sanchez suffering serious physical injury and, ultimately, death, and thereby experiencing economic harm, loss of future earning capacity, pain, suffering, loss of enjoyment and quality of life, and emotional distress.

///

///

49. Based on the allegations set forth herein, Mr. Sanchez is entitled to and seeks to recover punitive damages and penalties against EPD Officers in their individual and personal capacities, pursuant to 42 U.S.C. § 1983.

50. Based on the allegations set forth herein, Mr. Sanchez is entitled to and seeks to recover reasonable and necessary attorney fees and costs incurred in prosecuting this action, pursuant to

## SECOND CLAIM FOR RELIEF

### 42 U.S.C. § 1983 – Fourteenth Amendment – *Monell* – Failure to Protect –

### Against the City and Chief Skinner

51. Mr. Sanchez re-alleges paragraphs 1 through 42 and incorporates them by reference as though fully set forth herein.

52. Mr. Sanchez alleges this claim for relief against the City and Chief Skinner and would have had a right to do so had he survived his injuries.

53. At all material times, the City and Chief Skinner were aware of and consciously disregarded a substantial risk that individuals suffering from mental health crises who are taken into custody will harm themselves and / or commit suicide.

54. Given the City's and Chief Skinner's knowledge of the risk of harm as alleged herein, the following policies, practices, and / or customs, each on its own and all of them collectively, were the moving force that resulted in the deprivation of Mr. Sanchez's constitutional rights:

a) A policy, custom, and / or practice of officers, at their discretion, transporting individuals suffering from acute mental health crises and showing signs of self-harm to the hospital rather than summoning an ambulance;

///

///

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON 97401-6041
(541) 683-2004

b) A policy, custom, and / or practice of officers, at their discretion, transporting individuals suffering from acute mental health crises and showing signs of self-harm to the hospital before summoning medical assistance to check on their well-being;

c) A policy, custom, and / or practice of officers, at their discretion, transporting individuals suffering from acute mental health crises and showing signs of self-harm unsecured in the back of a police vehicle while having both hands and feet bound;

d) A policy, custom, and / or practice of officers, at their discretion, continuing to transport individuals in police vehicles who appear to be causing themselves injury while in transport without stopping to better secure them, check on their well-being, and / or summon medical assistance; and

e) A policy, custom, and / or practice of failing to establish and employ a method for inter- and / or intra-agency communication regarding individuals in the local community who appear to be suffering from a deteriorating mental illness.

55. At all material times, the City was aware of and consciously disregarded a substantial risk that individuals suffering from mental health crises who are taken into custody will harm themselves and / or commit suicide.

56. The policies, practices, and / or customs as alleged herein deprived Mr. Sanchez of the rights, privileges, and immunities provided by the Fourteenth Amendment to the United States Constitution in that they were the actual and proximate cause of the denial, delay, or intentional interference with Mr. Sanchez obtaining medical treatment, in deliberate indifference to the Mr. Sanchez's serious medical needs, for his serious but treatable mental health condition, when the city knew that failure to treat individuals suffering from mental health crises could result in further significant injury or death.

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON 97401-6041
(541) 683-2004

57. In failing to protect Mr. Sanchez as alleged herein, the City acted individually and by and through the actions and omissions of Chief Skinner, acing in his official capacity as the chief of police for the City.

58. The deprivation of Mr. Sanchez's constitutional rights as alleged herein was the direct and proximate cause of Mr. Sanchez suffering serious physical injury and, ultimately, death, and thereby experiencing economic harm, loss of future earning capacity, pain, suffering, loss of enjoyment and quality of life, and emotional distress.

59. Mr. Sanchez is entitled to and seeks to recover reasonable and necessary attorney fees and costs incurred in prosecuting this action, pursuant to 42 U.S.C. § 1988.

### THIRD CLAIM FOR RELIEF

### 42 U.S.C. § 1983 – Fourteenth Amendment – *Monell* – Failure to Train –

### Against the City and Chief Skinner

60. Mr. Sanchez re-alleges paragraphs 1 through 42 and incorporates them by reference as though fully set forth herein.

61. Mr. Sanchez alleges this claim for relief against the City and Chief Skinner and would have had a right to do so had he survived his injuries.

62. At all material times, the City and Chief Skinner were aware of and consciously disregarded a substantial risk that individuals suffering from mental health crises who are taken into custody will harm themselves and / or commit suicide.

63. At all material times, the City and Chief Skinner failed to train in that, as a matter of policy, custom, and / or practice, the City's training program was inadequate to properly train city employees on the following:

    a)   Policies regarding how to identify individuals suffering from mental health crises;

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON  97401-6041
(541) 683-2004

b) Policies regarding the treatment of individuals suffering from mental health crises;

c) Policies regarding positional asphyxia;

d) Policies regarding prisoner transport;

e) Policies regarding tactics and techniques of de-escalation, delayed custody, and / or disengagement;

f) Policies regarding the proper use of FRDs;

g) Policies regarding the use of continuous monitoring while an individual is bound with an FRD;

h) Policies regarding immediately summoning medical assistance when an individual in custody is experiencing excited delirium while in an FRD;

i) Policies regarding summoning medical assistance for people suffering from a mental health crisis and / or harming themselves; and

j) Policies regarding transporting individuals in custody to the hospital by ambulance.

64. The failure to train as alleged herein amounts to deliberate indifference to the rights of individuals suffering from mental health crises with whom EPD officers come into contact.

65. The failure to train as alleged herein deprived Mr. Sanchez of the rights, privileges, and immunities provided by the Fourteenth Amendment to the United States Constitution.

66. In failing to train as alleged herein, the City acted individually and by and through the actions and omissions of Chief Skinner, acing in his official capacity as the chief of police for the City.

67. The deprivation of Mr. Sanchez's constitutional rights as alleged herein was the direct and proximate cause of Mr. Sanchez suffering serious physical injury and, ultimately, death, and

///

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON 97401-6041
(541) 683-2004

thereby experiencing economic harm, loss of future earning capacity, pain, suffering, loss of enjoyment and quality of life, and emotional distress.

68. Based on the allegations set forth herein, Mr. Sanchez is entitled to and seeks to recover reasonable and necessary attorney fees and costs incurred in prosecuting this action, pursuant to 42 U.S.C. § 1988.

## FOURTH CLAIM FOR RELIEF

### 42 U.S.C. § 12133 and 29 U.S.C. § 794 – Discrimination Based Upon Disability –

### Against the City

69. Mr. Sanchez re-alleges paragraphs 1 through 42 and incorporates them by reference as though fully set forth herein.

70. Mr. Sanchez alleges this claim for relief against the City and would have had a right to do so had he survived his injuries.

71. The City is a public entity under title II of the ADA. 42 U.S.C. § 12131(1)(A).

72. On information and belief, the City receives federal assistance and funds. It is therefore subject to the Rehab Act.

73. Mr. Sanchez was an individual with a mental illness, disability, and / or medical impairment that substantially limited his ability to care for himself and / or control his mental or physical health and was regarded as a person having such an impairment, and he is therefore a qualified person under the following: the ADA, 42 U.S.C. § 12131; Section 504 of the Rehab Act, 29 U.S.C. § 794; and 28 C.F.R. 42.540(k).

74. As an individual with a disability, Mr. Sanchez was qualified to participate in or receive the benefit of the City's services, programs, and / or activities, and to be free from discrimination by the City on the basis of his disability.

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON 97401-6041
(541) 683-2004

75. Mr. Sanchez was excluded from participation in and / or denied access to the City's services, programs, and / or activities, and he was subjected to discrimination by the City, in that the City, by and through its employees, agents, or apparent agents, failed to reasonably accommodate Mr. Sanchez's disability in the course of investigation and arrest, causing him greater injury and indignity in that process than other arrestees.

76. The City's failure to reasonably accommodate Mr. Sanchez's disability as alleged herein was the direct and proximate cause of Mr. Sanchez suffering serious physical injury and, ultimately, death, and thereby experiencing economic harm, loss of future earning capacity, pain, suffering, loss of enjoyment and quality of life, and emotional distress.

77. Based on the allegations set forth herein, Mr. Sanchez is entitled to and seeks to recover reasonable and necessary attorney fees and costs incurred in prosecuting this action, pursuant to 29 U.S.C. § 794(b) and 42 U.S.C. § 12205.

## FIFTH CLAIM FOR RELIEF

### Pendant State Law Claim – ORS 30.265 – Wrongful Death – Against the City

78. Mr. Sanchez re-alleges paragraphs 4 through 6, paragraph 8 (except the last sentence), and paragraphs 21 through 42 and incorporates them by reference as though fully set forth herein.

79. The City, by and through its employees, agents, or apparent agents, including, but not limited to, all other Defendants named herein, was negligent in one or more of the following ways:

    a)  Failing to properly identify Mr. Sanchez as a person suffering from a mental health crisis;

///

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON 97401-6041
(541) 683-2004

b)  Failing to properly secure Mr. Sanchez in the police vehicle so as to provide his safe transport;

c)  Failing to properly position Mr. Sanchez in the police vehicle so as to provide his safe transport;

d)  Failing to continuously monitor Mr. Sanchez while he was in the police vehicle;

e)  Failing to summon medical assistance;

f)  Failing to attempt de-escalation tactics and techniques during the arrest of Mr. Sanchez;

g)  Failing to disengage from Mr. Sanchez and / or to delay taking him into custody until he could be calmed and dealt with by professional mental health specialists;

h)  Failing to properly train its employees, including police officers, to reasonably deal with persons with obvious mental health issues;

i)  Failing to request assistance from individuals with specialized training in mental illness;

j)  Failing to recognize Mr. Sanchez's conduct as being potentially dangerous to his self;

k)  Using emergency lights and / or sirens unnecessarily and / or excessively;

l)  Failing to attempt to establish a safe environment that would be conducive to successful de-escalation and resolution of the incident;

m)  Failing to consult with a mental health or medical professional when determining the appropriate disposition of Mr. Sanchez;

n)  Failing to either cite and release Mr. Sanchez or to initiate the police hold process;

o)  Failing to request an ambulance to transport Mr. Sanchez to the hospital;

///

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON  97401-6041
(541) 683-2004

p) Failing to establish and employ a method for inter- and / or intra-agency communication regarding individuals in the local community who appear to be suffering from a deteriorating mental illness; and

q) Providing a police vehicle in which the seat belt and shoulder restraint could become dangerously wrapped around an individual's neck during transport.

80. The City's negligence as alleged herein was the proximate cause of Mr. Sanchez's death on September 28, 2019 which resulted in the following damages to his estate and statutory beneficiaries:

a) Burial and memorial service expenses;

b) Pecuniary loss to decedent's estate;

c) Pecuniary loss to decedent's minor son, Nathan Michael Joseph Sanchez, born May 31, 2010;

d) Loss of the society, companionship, and services to Mr. Sanchez's minor son, Nathan Michael Joseph Sanchez, in the amount of $5,000,000.00;

e) Loss of the society, companionship, and services to Mr. Sanchez's father, Julio Sanchez, in the amount of $500,000.00; and

f) Loss of the society, companionship, and services to Mr. Sanchez's mother, Sandra Ann Twaroski, in the amount of $500,000.00.

81. The City's negligence as alleged here in was also a substantial factor and the proximate cause of Mr. Sanchez sustaining extreme pain and suffering, emotional and mental distress, and disability, including complete paralysis, coma, and loss of physical, mental, and emotional awareness between the time of his injury and his death 241 days after his injury, all to his noneconomic damages in the amount of $3,000,000.00 (ORS 30.020(2)(b) and ORS 30.075(1)).

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON 97401-6041
(541) 683-2004

WHEREFORE, Plaintiff prays for relief and judgment as follows:

**REQUESTED RELIEF FOR CLAIMS 1 through 4**

a)  Compensatory damages against all Defendants in an amount that is fair, just and reasonable and to be determined according to proof at trial;

b)  Punitive damages against EPD Officers, pursuant to 42 U.S.C. § 1983, in an amount that is fair, just and reasonable and to be determined according to proof at trial; and

c)  All other damages, penalties, attorney's fees, costs, and interest allowed by 29 U.S.C. § 794(b), 42 U.S.C. §§ 1983 and 1988, 42 U.S.C. § 12205, and that are otherwise allowed by federal law.

**REQUESTED RELIEF FOR CLAIM 5 – AGAINST THE CITY**

a)  Burial and memorial service expenses;

b)  Pecuniary loss to decedent's estate;

c)  Pecuniary loss to decedent's minor son, Nathan Michael Joseph Sanchez, born May 31, 2010;

d)  Loss of the society, companionship, and services to Mr. Sanchez's minor son, Nathan Michael Joseph Sanchez, in the amount of $5,000,000.00;

e)  Loss of the society, companionship, and services to Mr. Sanchez's father, Julio Sanchez, in the amount of $500,000.00;

f)  Loss of the society, companionship, and services to Mr. Sanchez's mother, Nathan Sandra Ann Twaroski, in the amount of $500,000.00;

///

///

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON  97401-6041
(541) 683-2004

g) Non-economic and economic damages of $3,000,000.00 for Mr. Sanchez's claim per ORS 30.020(2)(b); and

h) Plaintiff's costs and disbursements incurred herein.

DATED this 28th day of January, 2021.

LAW OFFICE OF ROBERT A. MILLER

Robert A. Miller, OSB #732050
ram@miller-wagner.com
Attorney for Plaintiff

LAW OFFICE OF
**ROBERT A. MILLER**
2260 OAKMONT WAY, SUITE 7
EUGENE, OREGON 97401-6041
(541) 683-2004

COMPLAINT - Page **24** of 24